**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| NICOLE DIFLUMERI and LISA REINGOLD, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No.: 6:25-cv-01899-AGM-LHP |
| v. | |
| RAYMOND JAMES FINANCIAL, INC., | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## I. INTRODUCTION

In its Motion to Dismiss ("Motion"), Raymond James ("Defendant") makes multiple about-faces. Defendant's Cookie Banner unambiguously offered Plaintiffs the option to "decline" tracking and targeting by AdTech Companies, and both Plaintiffs clicked "Decline," accepting Defendant's offer. Any rational person would expect the tracking and targeting to stop. *But now*, Defendant tells this Court the Cookie Banner is a sham promise—mere "informational disclosures"—and "Plaintiffs may ignore the Cookie Consent Banner, select 'Accept,' or select 'Decline,' but regardless of that choice, Plaintiffs would have the *same access* to the website." Doc. No. 28, at 25 (emphasis in original).

The Cookie Banner and Privacy Policy manifest that Defendant understood and recognized that internet privacy has value and many users do not want to be tracked and targeted. *But now*, Defendant contends sensitive personal communications have no value to sustain Article III standing.

In its motion to remove, Defendant asserted this Court had subject matter jurisdiction over all eleven claims. Doc. No. 1. *But now*, Defendant improperly seeks to remand a *portion* of the case *it removed* back to state court for lack of subject matter jurisdiction. Effectively, Defendant oddly requests this Court to bifurcate this case and remand the three statutory claims to state court while this Court retains jurisdiction over the remaining eight claims, including the claims for intrusion upon seclusion that the 11th Circuit and Supreme Court have recognized as the historical antecedent

supporting standing for the statutory claims. Defendant was right the first time when it removed.

In addition, Defendant moves to dismiss all eleven counts for failure to state a claim. Each argument fails because Defendant misconstrues the law and, rather than accepting the factual allegations as true, mischaracterizes, overlooks, or even argues with them. Defendant promised Plaintiffs that if they clicked "Decline" and continued to use its Website services, it would turn off the AdTech Trackers. But Defendant broke that promise. Its representations were *mis*representations. Instead, the AdTech Trackers continued to track Plaintiffs, without their consent, in violation of multiple statutory prohibitions and common law. Plaintiffs' resulting injuries are concrete, multi-faceted, and cascading. After Plaintiffs told Defendant to stop, Defendant continued to share Plaintiffs' sensitive financial information with AdTech Companies, those AdTech Companies used that illegally intercepted information to build profiles on them, *and* they used the information to target Plaintiffs with downstream behavioral marketing that further invaded their privacy, *including* on behalf of Defendant itself. Defendant's motion should be denied.

## II. BACKGROUND

Defendant operates www.raymondjames.com ("Website") through which users and accountholders, like Plaintiffs Nicole Diflumeri and Lisa Reingold research, obtain, and monitor financial products and services. Doc. No. 1-1 (hereinafter, "Compl.") ¶¶ 9-10. In addition to using its Website to profit from soliciting its products to users, Defendant installed and configured AdTech Trackers

to monitor its users' interactions so it could also monetize its *users*, by facilitating the collection and analysis of their online communications to fuel highly profitable behavioral advertising networks. *Id.* ¶¶ 2, 17-18, 34-49, 55-88. The Adtech Trackers, developed by some of the largest behavioral advertising companies in the world—Google, Meta, X (Twitter), Linkedin and Microsoft—intercept and digest communications between users and the Website in real time. *Id.* ¶¶ 2, 17-18, 34-49, 55-88. These communications include sensitive communication, including requests for investment information, users' specific search terms, users' locations via the entry of zip codes, the identities of their financial advisors, the fact that they have called their advisors, and the fact that they possess accounts. *Id.* ¶ 5.

In addition to learning what users are doing on the Website, the AdTech Companies use the unlawfully collected information to build specific, individual profiles for all online users through the use of unique identifiers, which help them send unwanted behavioral advertisements to users—including Plaintiffs—based on users' past and current online behaviors. *Id*. ¶¶ 8, 33-95. Of course, Defendant profits as well, using the behavioral advertising itself to maximize its marketing and remarketing practices. *Id*. ¶¶ 4, 19, 20. Contrary to Defendant's representation to this Court, this tracking and targeting is not "anonymous." Motion at 1. The AdTech Companies link the intercepted content to specific profiles. For example, Meta uses information digested from its "c_user cookie" to specifically identify a Facebook user and links that information to the user's Facebook profile. *Id.* ¶ 67 n. 16.

Appreciating the importance of internet privacy, Defendant offered its users the ability to interact with its website privately, free from the omnipresent AdTech Trackers. It did so through its Cookie Banner, where users unambiguously inform Defendant that they "decline" the use of marketing and advertising cookies. *Id*. ¶¶ 2-4, 19-20, 27-30. Plaintiffs and the Class members are those users who clicked "Decline;" and, naturally, both Plaintiffs believed that selecting "Decline" would cause Defendant to cease operating marketing and advertising cookies (because that's exactly what Defendant said it would do). *Id*. ¶¶ 98-99, 108-109.

Collection of this online information is troublesome enough, *id.* ¶ 6, and the AdTech Companies' own policies instruct customers (like Defendant) not to deploy their technology on websites where sensitive financial information is collected. *Id.* ¶¶ 6, 64, 70, 76, 82 & 87. Despite these warnings, Defendant not only installs and operates the AdTech Trackers on its financial Website but continues to operate those AdTech Trackers after Plaintiffs and other users expressly instructed it to stop. *Id*. ¶¶ 34-54. Such egregious conduct breaches the agreement between Defendant and its Website users, invades their privacy, and violates multiple wiretapping statutes.

## III. PLAINTIFFS HAVE ARTICLE III STANDING.

### a. Defendant Asserted This Court's Jurisdiction When it Removed But Now Contends Lack of Article III Standing for (Only) Three Counts.

After asserting that this Court has subject matter jurisdiction in its Notice of Removal (Doc. No. 1.), Defendant has now changed course and improperly seeks to remand (only) three of the eleven counts back to state court for lack of subject matter

jurisdiction.[1] Defendant was right the first time when it removed—Plaintiffs have Article III standing. A 2021 essay in the Harvard Law Review Forum gave a name to Defendant's tactic here: fraudulent removal.[2]

**b. Legal Standard.**

A motion to dismiss filed pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Facial 12(b)(1) motions like this one are analyzed similarly to a Rule 12(b)(6) motion. *McElmurray v. Cons. Gov. of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). That is, "the court looks to the face of the complaint and determines whether the plaintiff sufficiently alleges standing." *Echeverri Mancilla v. Brennan Seng*, No. 6:24-CV-01065-PGB-DCI, 2025 WL 2443624, at *2 (M.D. Fla. Aug. 24, 2025) (citing *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008)).

To establish standing, a plaintiff must demonstrate "that she suffered an injury in fact that is concrete, particularized, and actual or imminent[,]…that the defendant likely caused' her injury[,] and that a favorable judicial decision can likely redress her injury." *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) (citing *Transunion v. Ramirez*, 594 U.S. 413, 423, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021) (citation modified)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a

---

[1] In this context of removal, when a district court concludes it does not have subject matter jurisdiction, the court "must remand that removed case back to state court." *Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.*, 34 F.4th 988, 993–94 (11th Cir. 2022); *see also* 28 U.S.C. § 1447(c).

[2] Zachary D. Clopton & Alexandra D. Lahav, *Fraudulent Removal*, 135 HARV. L. REV. F. 87 (2021) ("The clearest example of fraudulent removal is when a defendant removes a case to federal court and plans to immediately argue that the federal court lacks subject matter jurisdiction.")

personal and individual way.'" *Gardner v. Mutz* 962 F.3d 1329, 1342 (11th Cir. 2020) (holding particularity means the plaintiff is not "merely a concerned bystander") (quoting *Lujan*, 504 U.S. at 560 n.1). "An injury is concrete if it actually exists—that is, if it is 'real, and not abstract.'" *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242 (11th Cir. 2022) (en banc) (quoting *Spokeo*, 578 U.S. at 340).

Intangible harms can satisfy Article III's concreteness requirement particularly where those harms bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. at 425. Those historically-recognized torts "include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* Further, "Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.*

**c. Plaintiffs' Statutory Claims (Counts One, Three and Seven) Support a Concrete and Particularized Injury.**

Consistent with the well-developed jurisprudence, Plaintiffs' injuries related to their three statutory claims bear a close relationship to common law intrusion upon seclusion. Even though Plaintiffs bring a claim for intrusion upon seclusion (unchallenged by Defendant on standing grounds), Defendant still fails to recognize or undertake the required comparative analysis to historically-recognized torts.[3] The

[3] *See Kellman v. Spokeo, Inc.*, No. 21-CV-08976-WHO, 2024 WL 2788418, at *6 (N.D. Cal. May 29, 2024) (rejecting authorities finding no concrete injury where they failed to perform a proper *Transunion* analysis).

Supreme Court in *TransUnion* recognized intrusion upon seclusion *specifically* as among the concrete intangible harms traditionally recognized as providing a basis for lawsuits in American courts. *TransUnion*, 594 U.S. at 425; *see also Drazen v. Pinto,* 74 F. 4th at 1343-45; *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340–41 (11th Cir. 2017). And each of the statutes at issue protect from harms closely related to common law intrusion upon seclusion. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117–18 (9th Cir. 2020) (holding that ECPA and CIPA section 631 bear a close relationship to violations of the right to privacy actionable under common law); *Minotty v. Baudo*, 42 So. 3d 824, 831 (Fla. Dist. Ct. App. 2010) ("Chapter 934 [of FSCA] was modeled after the Federal Wiretap Act, 18 U.S.C. section 2510 *et seq*.").

The Restatement (Second) of Torts defines intrusion upon seclusion as occurring when a person "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Jackman v. Cebring-Swartz*, 334 So.3d 653, 656 (Ct. App. Fl. 2nd May 28, 2021) (citing Restatement (Second) of Torts § 652B (Am. Law Inst. 1977)); *see also Campbell*, 951 F.3d at 1117-18 (finding a "straightforward analogue" between intrusion upon seclusion and the protections of ECPA and CIPA where "the intrusion itself" supports liability); and *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) (violations of ECPA and CIPA of the type alleged here involve a clear *de facto* injury for Article III standing). The intangible harm alleged in the complaint need only be "similar to" the common-

law comparator, not "an exact duplicate." *Drazen*, 74 F.4th at 1343. "To find the sweet spot between similar yet not identical, now-Justice Barrett has said that we should ask whether the harms share 'a close relationship in kind, not degree.'" *Id.* (quoting *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)).

The critical component to *this* privacy action rests in Defendant's own decision to *offer* Plaintiffs and class members a safe, secure, *private* space in which to conduct their affairs. Plaintiffs' clear manifestation of their acceptance of this offer and their reliance on it bolsters their expectation of privacy beyond the traditional norms to which internet users are accustomed. By offering a private browsing space, Defendant's Cookie Banner manifests that its AdTech Trackers are antagonistic to internet privacy and that *Defendant understands this*. There is no doubt that a third party's reading of Plaintiffs' communications with their financial advisor causes harm that is "real, and not abstract." *Huntstein*, 48 F.4th at 1242.

And the injuries do not stop with the real-time interception: Plaintiffs were repeatedly injured by Defendant when (a) the AdTech Companies used the illegally obtained information to construct and bolster profiles on Plaintiffs, (b) the AdTech Companies used the illegally obtained information to serve behavioral advertising on other Websites they visited, and (c) the AdTech Companies used that same information to fuel Defendant's marketing targeted at Plaintiffs. Compl ¶¶ 18, 57-58, 62, 66-69; *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1311 (N.D. Ga. 2022) ("At the motion-to-dismiss stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice' to demonstrate standing because those general

allegations are presumed to embrace the specific facts needed to support them." (quoting *Lujan*, 504 U.S. at 561)). Under the clear jurisprudence, the type of harms redressed by ECPA, FSCA, and CIPA satisfy the concreteness requirement for Article III standing.[4]

As users of the Website, Plaintiffs' concrete injuries are particularized because their privacy interests Defendant violated are "distinct" to each of their communications and personal experiences on the Website. *Gardner*, 962 F.3d at 1342 (distinguishing personal injuries from "undifferentiated, collective" injuries such as those concerning "mere interest in a problem[.]") Each Plaintiff communicated with Defendant via the Website to manage their financial investments, which facilitated AdTech Companies' ability to learn their communications, including the fact that Plaintiffs have accounts and financial planners with Defendant. Compl. ¶¶ 97, 107. Plaintiffs' allegations do not take issue with the presence of AdTech Trackers on the Website conceptually—they take issue with the AdTech monitoring *their* unique communications with Defendant. *Id*. Both Plaintiffs and each class members' independent communications with Defendant have been intercepted, read, learned, and used by the AdTech Companies in violation of their express withholding of consent. This practice injured them in the moment *and* via cascading harms through

[4] Cases cited by Defendant in its Motion to the contrary are easily distinguishable: *Muransky*, *Trichell* and *Nelson* all dealt with injuries that bore no relationship to a harm recognized historically by American courts, and the *Muransky* court distinguishes that lack of concreteness with the intrusion upon seclusion analysis applicable this case. *Muransky v. Godiva Chocolatier*, Inc., 979 F.3d 917, 926–28 (11th Cir. 2020) (en banc); *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 997–98 (11th Cir. 2020); and *Nelson v. Experian Info. Sols. Inc.*, 144 F.4th 1350, 1353 (11th Cir. 2025).

the downstream profile-building and targeted advertising. Plaintiffs are not "merely a concerned bystander." *Gardner*, 962 F.3d at 1362.[5]

**d. Defendant Concedes Standing for The Other Eight Claims.**

Defendant rightfully concedes standing for the other eight claims; but, in doing so, effectively requests this Court to bifurcate this case and remand the three statutory claims to state court while retaining jurisdiction over the remaining claims. As detailed above, the Supreme Court and the Eleventh Circuit have recognized Plaintiffs' unchallenged tort claims (all grounded in traditional privacy injuries like intrusion upon seclusion) as providing a basis for standing. *TransUnion*, 594 U.S. at 425; *Drazen,* 74 F. 4th at 1343-45; *Perry*, 854 F.3d at 1340–41. Plaintiffs also have standing to sue for breach of contract. "[T]he breach of a contract has long been held to be among the types of injuries that confer standing to sue." *E.A. Renfroe & Co. v. Moran*, 249 F. App'x 88, 91 (11th Cir. 2007) (citing *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 83 L.Ed. 543 (1939)).

## IV. PLAINTIFFS STATE A PLAUSIBLE CLAIM ON EVERY COUNT

**a. Legal Standard.**

In deciding a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326

[5] Contrary to Defendant's assertions, these are not "conclusory" allegations. In part, the Complaint is reiterating Defendant's own description of the systematic operation of the AdTech Trackers in its privacy policies. Compl. ¶¶ 19 (Figure 2), 20.

(11th Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**b. Statutory Wiretapping Claims (Counts One, Three and Seven).**

ECPA, FSCA, and CIPA all require the Plaintiff to show that the content of communications was intercepted, and ECPA and CIPA (but *not* FSCA) require that the interception was made contemporaneously. *See D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1199 (S.D. Cal. 2024) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act"); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (analyzing the FSCA in comparison with ECPA and CIPA cases). Therefore, Plaintiffs analyze these elements first as to all three statutes before addressing issues particular to the statutes in turn.

**i. The Complaint Clearly Pleads that Defendant Intercepted the Contents of Plaintiffs' Communications.**

ECPA defines "Contents" as "when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication."18 U.S.C. § 2510. The Ninth Circuit has further held that "contents" "refers to the intended message conveyed by the

communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). Record information "includes, among other things, the 'name,' 'address,' and 'subscriber number or identity' of 'a subscriber to or customer of such service.'" *Id.* at 1104 (quoting 18 U.S.C. § 2703(c)).

Defendant tracked specific search terms input by Plaintiffs into fields on Defendant Website. *See* Compl. ¶¶ 36-39. It is well-established that search terms input by website visitors and descriptive URLs containing those terms constitute "contents" under ECPA, FSCA, and CIPA. *See, e.g., W.W. v. Orlando Health, Inc.*, No. 6:24-CV-1068-JSS-RMN, 2025 WL 722892, at *4-5 (M.D. Fla. Mar. 6, 2025); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 893–94 (S.D. Cal. 2025); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 935–36 (N.D. Cal. 2023).

**ii. The Interception was Contemporaneous.**

At the pleading stage, where all factual inferences are construed in Plaintiffs' favor, the Complaint's detailed factual allegations are more than sufficient to survive a motion to dismiss. For each of the five AdTech Companies, the Complaint provides detailed allegations demonstrating how the interceptions systematically occur in real time as the user inputs the information into the Website, even providing Figures (*see* Compl. Fig. 12-19)[6] that reveal how, as users like Plaintiffs input the information into

[6] The network traffic shown in Figures 12-19 was documented using a web browser's standard developer tools. These developer tools allow developers to inspect exactly what is going on behind the scenes as a webpage loads in real time, including what AdTech Tracking Technology script is present, what AdTech Trackers they are using, and how those AdTech Trackers are intercepting,

the Website, the AdTech Company intercepts the content, digests it, and even categorizes it instantaneously. Compl. ¶¶ 34-53. It is well-recognized across the jurisprudence that "allegations that [communications] are intercepted in real time through the use of computer code provides sufficient factual detail to support the 'in transit' requirement." *Mata v. Zillow Grp., Inc.*, No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024) (quoting *Esparza v. UAG Escondido A1 Inc.*, 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024)). Indeed, Plaintiffs' detailed allegations go beyond the initial pleading requirements. "On a motion to dismiss, a plaintiff need not prove their theory of interception, but rather must provide fair notice to [d]efendants of when they believe [the defendant] intercepts their communications." *Gray v. Luxottica of Am., Inc.*, No. 8:24-CV-00160-MRA-DFM, 2024 WL 5689566 at *7 (C.D. Cal. Dec. 16, 2024) (internal quotes removed). Defendant is undoubtedly on fair notice.

Courts have cautioned that "a pleading standard to the contrary would require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant and its third-party recorder." *D'Angelo v. Penny OpCo, LLC*, No. 23-cv-0981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023). This reasoning is reflected in numerous opinions. *See, e.g., Heerde v. Learfield Commc'ns, LLC*,

digesting and categorizing communications in real time. *See Inspect network activity*, CHROME DEVTOOLS, https://developer.chrome.com/docs/devtools/network (last visited December 11, 2025).

741 F. Supp. 3d 849, 862-63 (C.D. Cal. 2024); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894 (S.D. Cal. 2025); *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-CV-00667-JST, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053-54 (N.D. Cal. 2025*); Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 838-39 (E.D. Cal. 2025); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1030-31 (S.D. Cal. 2023).

#### iii. The "Party Exception" Does Not Apply In the Presence of Criminal or Tortious Conduct.

Although Plaintiffs' allegations satisfy every element of ECPA, Defendant argues the interception of Plaintiffs' communications is not unlawful because (admitting that it installed and permitted the AdTech Trackers to collect the contents of their communications) Defendant *itself* is a party to the communications. *See* 18 U.S.C. § 2511(2)(d). However, this "party exception" to liability under ECPA does not extend to ECPA violations in which communications were intercepted for a tortious or criminal purpose; and on that basis, the defense fails. *Id*.

First, Defendant aided the AdTech Companies to learn sensitive information in violation of the Gramm-Leach-Bliley Act ("GLBA"), under which financial institutions (like Defendant) are prohibited from disclosing the "nonpublic personal information" of consumers without providing notice. 15 U.S.C. § 6802(a). Defendant is a "financial institution" as defined by 15 U.S.C. § 6809(3)(A)[7] because it engages in

[7] "The term 'financial institution' means any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 15 U.S.C. § 6809(3)(A).

"financial, investment, or economic advisory services." 12 U.S.C. § 1843(k)(4)(C). Relevant here, "nonpublic personal information" is defined in the statutory scheme as personally identifiable financial information "(i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution," 15 U.S.C. § 6809(4)(A), and "consumer" is defined as "an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes…" 15 U.S.C. § 6809(9). Moreover, "personally identifiable financial information" is defined in Federal Trade Commission regulations to include the *precise* information collected here — "any information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. § 313.3(o)(2)(i)(F).

Plaintiffs are consumers under the GLBA as individual account holders who used the Website to check their personal brokerage accounts. Furthermore, their requests for investment information typed into fields and titles of pages they visited to learn about managing their finances were disclosed by Defendant to third-party AdTech companies in defiance of their express denial of consent. *See*, *supra*, Section II. Although the GLBA lacks a private right of action, Defendant's ECPA violations were clearly committed with the purpose of violating the GLBA when it shared sensitive nonpublic personal information with the AdTech Companies without consent of the Plaintiffs. *See Orlando Health*, 2025 WL 722892, at *7 (finding allegations

that interceptions violated HIPAA sufficient to invoke the crime-tort exception at the pleading stage).

Second, Defendant's tortious conduct does not stop with the contemporaneous interception. Defendant's interceptions were further done with the purpose to intrude upon the Plaintiffs' seclusion by targeting them *downstream* with advertisements which Plaintiffs specifically denied Defendant authority to do. *See*, *e.g.*, Compl. ¶¶ 4, 18, 19-20; *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019) (holding intrusion upon seclusion claim sufficient based on receipt of advertisement plaintiff previously took steps to avoid). Plaintiffs rejected the use of cookies on the Website to avoid receiving targeted advertising. Defendant tortiously disregarded that rejection, illegally intercepted the content and *also* tortiously used the intercepted content to target Plaintiffs with advertisements.

Lastly, Defendant's reliance on § 2511(2)(d) is improper. Defendant is effectively stating it can *intentionally* and *flagrantly* defraud its customers into providing sensitive personal and financial information to AdTech companies so that it can boost its marketing results. *Nothing* in the ECPA "party exception" permits Defendant to affirmatively offer its users a secure, private space in which to conduct their business only to betray those users trust by sharing their communications with AdTech Companies and using them for behavioral marketing. Such undeniably tortious behavior is clearly intended to fall within the scope of the crime-tort exception to the party exception.

**iv. The FSCA Applies to Website Tracking Claims.**

Defendant wrongly contends that the FSCA is "inapplicable to website tracking technology." Doc. No. 28, at 16. Florida state and federal courts have held otherwise. *See, e.g., Orlando Health*, 2025 WL 722892, at *3-5;[8] *D.S. v. Tallahassee Mem'l HealthCare*, No. 4:23CV540-MW/MAF, 2024 WL 2318621, at *1–2 (N.D. Fla. May 22, 2024). Further, the "session replay" technology at issue in *Jacome v. Spirit Airlines*, No. 2021-000947-CA-01, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), is easily distinguishable from AdTech tracking technology in several crucial respects that the court summarized well in *Gabrielli v. Haleon US Inc.,* which involved the same AdTech tracking technology relevant here:

> The tracking technologies are also distinguishable [from session reply technology], both in users' interactions with them and their capabilities. [Plaintiff in a session-replay case] never purported to have expressly "reject[ed]" the tracking technology at issue. Indeed, the session-replay technology was not alleged to track anything beyond her interactions with the website she chose to visit, and the information gathered was only alleged to be used by the owner of that website. In contrast, [Plaintiff here] alleges that the cookies [Defendant] stores on users' devices allow third parties "to track and collect data in real time regarding ... user input data," which includes "[t]he information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information, demographic information," and also "device information, session information, and/or geolocation data." Compl. ¶¶ 5, 68.

---

[8] Defendant's Motion unsuccessfully attempts to preemptively distinguish *Orlando Health* on the grounds that it involved tracking on a healthcare provider's website and the unsupported notion that the FSCA was "enacted with medical records in mind." Doc. No. 28, at 18. In *Orlando Health*, the court noted that ECPA (upon which the FSCA was modeled) was amended "to protect private personal and business records (like medical records) from interception on computerized recordkeeping systems." *Orlando Health*, 2025 WL 722892, at *4 (quoting *Jacome*, 2021 WL 3087860, at *2). Personally identifiable financial information applies with equal force as health information. Each is recognized by federal law as sensitive – HIPPA for health and GLBA for finance. In any event, *Orlando Health* contradicts Defendant's assertion that the FSCA is inapplicable to website tracking technology.

No. 25-CV-02555-WHO, 2025 WL 2494368, at *7 (N.D. Cal. Aug. 29, 2025).

**v. Defendant's Invocation of the Rule of Lenity is Misplaced.**

The Rule of Lenity only applies when interpreting "a grievous ambiguity" in a statute, such that the court can "no more than guess as to what Congress intended." *United States v. Dawson*, 64 F.4th 1227, 1239 (11th Cir.), *cert. denied*, 144 S. Ct. 343, 217 L. Ed. 2d 184 (2023). Multiple courts have refused to extend the Rule of Lenity to CIPA and other wiretapping statutes in similar civil litigation, as should this Court. *See Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-94 (N.D. Cal. 2025); and *Mitchell v. Sonesta International Hotels Corporation*, No. CV-24-2603-GW-SSCx, 2024 WL 4417172 at *9 (C.D. Cal. Oct. 4, 2024) (denying motion to dismiss based on rule of lenity for CIPA § 631 claim for aiding and abetting).

**c. Common Law Claims.**

**i. Breach of Contract (Count Two)**

The elements of a breach of contract action are: "(1) a valid contract; (2) a material breach; and (3) damages." *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003). A valid, enforceable contract requires offer, acceptance, and consideration. *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. Dist. Ct. App. 2012). In analyzing whether an internet contract exists, the central question is mutual assent, which "turns on whether the relevant terms were reasonably presented and whether the user took clear, affirmative steps to accept them." *Valiente v. Nexgen Glob.*, LLC, No. 23-13308, 2025 WL 3140480, at *2 (11th Cir. Nov. 10,

2025). Under Florida law, such agreements are enforceable "when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Miami Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689 (Fla. Dist. Ct. App. 2025) (quoting *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. Dist. Ct. App. 2018)).

Here, Defendant displays a conspicuous popup Cookie Banner on the homepage of its Website with the option for users to "Decline" operation of the cookies as to them. *See* Compl. ¶ 2, Fig. 1. Plaintiffs here manifested their assent to be bound by clicking "Decline," with the reasonable understanding that by doing so, Defendant would refrain from targeting advertising cookies on Plaintiffs' use of the website. This reasonable understanding is confirmed by the "Manage Cookie Preferences," hyperlink, which further affirms that those who select "Decline" will "opt-out of these cookies" and "our third party partners will not be able to offer you personalized ads from us." Compl. ¶ 19, Fig. 2. This page also contains a hyperlink to Defendant's full Privacy Policy. *Id.* ¶ 20. Here, all of the relevant terms are clearly and conspicuously available. Defendant manifests assent to be bound by the user's choice to "Decline" advertising cookies, and the user manifests assent by clicking "Decline" and continuing to use Defendant's website under the agreed-upon terms.

Remarkably, Defendant mischaracterizes its Cookie Banner as merely "informational disclosures" (Doc. No. 28, at 25) and, in doing so, confirms that the Cookie Banner is the fraudulent sham the Complaint alleges it to be. As Defendant puts it: "Plaintiffs may ignore the Cookie Consent Banner, select 'Accept,' or select

'Decline,' but regardless of that choice, Plaintiffs would have the *same access* to the website." *Id.* (emphasis in original). Sadly, it's true that regardless of which option (Accept or Decline) the user chooses, the experience is the same. *But, critically, that is not what Defendant promised!* The clear promise in the Cookie Banner is that selecting "Decline" is meant to give Website visitors the assurance that their use of the Website is *different*, i.e., they will no longer be tracked and targeted by the AdTech Trackers installed by Defendant.

**ii. Intrusion Upon Seclusion (Invasions of Privacy) under Florida Law (Count Four) and California Law (Counts Eight & Nine)**

Florida courts apply the Restatement (Second) of Torts definition of intrusion upon seclusion, with the exception that a plaintiff must show "an intrusion into a private place and not merely a private activity." *Hammer v. Sorensen*, 824 F. App'x 689, 695 (11th Cir. 2020). This intrusion can be physical or electronic, such as entering someone's private quarters or electronically accessing private information. *Pet Supermarket, Inc. v. Eldridge*, 360 So. 3d 1201, 1206 (Fla. Dist. Ct. App. 2023).

Invasion of privacy under the California Constitution and intrusion upon seclusion under California common law are analyzed together. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Id.* (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287, 97 Cal. Rptr.3d 274, 211 P.3d 1063 (2009)). In determining whether an invasion is "highly offensive," California

courts consider "the degree and setting of the intrusion," along with "the intruder's motives and objectives." *Hernandez*, 47 Cal. 4th at 287. However, judges in the Ninth Circuit have repeatedly stated their "reluctan[ce] to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019); *see also Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1054 (N.D. Cal. 2018) (observing that whether conduct rises to the level of highly offensive "is indeed a factual question best left for a jury") (internal quotation marks and citation omitted).

#### ***1. Plaintiffs Have a Reasonable Expectation of Privacy Due to Defendant's Cookie Banner Representations.***

Here, Defendant created a private place by giving its Website visitors the option to browse its Website free from cookie tracking. The Northern District of California's analysis of a similar sham Cookie Banner in *Walsh v. Dollar Tree Stores, Inc.* is instructive:

> [A]s Plaintiffs persuasively argue, [Defendant] ***itself*** creates a reasonable expectation of privacy when it presents customers with a Cookie Banner permitting them to "Reject Advertising Cookies." . . . "Courts have held that plaintiffs have a reasonable expectation of privacy where data is collected without their consent." *In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1156 (N.D. Cal. 2021) (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 603) (finding that "it was reasonable for a user to believe that disabling Location History prevented Google from collecting and storing location data."). This case is of a like kind; having (allegedly) given users the option to "Reject Advertising Cookies" and so opt out of having their data tracked, [Defendant] cannot say that the users do not have a reasonable expectation of privacy in such data.

No. 25-CV-01601-SVK, 2025 WL 2939229, at *14 (N.D. Cal. Oct. 16, 2025) (emphasis in original). Cookie Banner cases such as this are distinguishable from the Middle District of Florida's analysis of intrusion upon seclusion in *W.W. v. Orlando Health, Inc.* where the plaintiff did not allege any facts indicating that the website provided notice to visitors that they had the option to accept or deny data tracking technology. 2025 WL 722892, at *1. Instead, the facts in that case indicate that the healthcare website installed tracking technologies "without informing its patients." *Id.* And the court thus concluded that the plaintiff did not state a claim for intrusion into a private place, rather than mere private activities. *Id.* at *9. In contrast, here, Defendant invited Plaintiffs into a private space (free of AdTech Trackers); Plaintiffs accepted that offer; and then Defendant intruded into that private space by operating the AdTech Trackers on the Website.

### ***2. The Intrusion was Highly Offensive Due to the Deceit Defendant Used to Collect the Data.***

Defendant collected sensitive user data, including browsing history, geolocational data, and user information concerning their handling of financial matters. In *Walsh v. Dollar Tree Stores, Inc.*, the Court considered this type of data tracking – along with the "plus factor" of the deceit used to obtain such data through a sham Cookie Banner – to adequately allege highly offensive conduct. 2025 WL 2939229, at *14 (citing *In re Google Location Hist. Litig.*, 514 F. Supp. at 1157-58). The type of deceit alleged in *Walsh v. Dollar Tree Stores, Inc.* is identical to the deceit used by Defendant here. As detailed above, courts have repeatedly stated their "reluctan[ce]

to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. at 797. Defendant's sham Cookie Banner easily clears that low bar at this pleading stage of the case.

**iii. Misrepresentation under Florida Law (Count Five) California Law (Count Ten).**

Plaintiffs' allegations are sufficient to demonstrate Defendant's liability for misrepresentation. Plaintiffs have clearly alleged that Defendant, via the Cookie Banner, misrepresented a material fact that its Website was a secure and private space; that Defendant knew that the representations were false and, *at minimum*, made the representations with reckless disregard concerning its truth; that Defendant intended for the Plaintiffs' to rely on its statement, that Plaintiffs did in fact rely on it; and that they suffered injuries. *LoanFlight Lending, LLC v. Wood*, 388 So. 3d 1027, 1031 (Fla. Dist. Ct. App. 2024) (quoting *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 650-51 (Fla. 3d DCA 2006)); *and Berry v. Frazier*, 90 Cal. App. 5th 1258, 1268, 307 Cal. Rptr. 3d 778, 789 (2023), *as modified on denial of reh'g* (May 15, 2023), *review denied* (Aug. 9, 2023).

In the Eleventh Circuit, Rule 9(b) is satisfied if the complaint sets forth "(1) the exact statements or omissions made; (2) the time and place of each such statement and who made the statement or omission; (3) the substance of the statement and how it misled the plaintiff; and (4) the defendant's gain due to the alleged fraud." *V.C. v. Evenflo Co., Inc.*, No. 6:20-CV-2-ORL-40GJK, 2020 WL 5803097, at *2 (M.D. Fla.

Mar. 20, 2020) (quoting *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1296 (M.D. Fla. 2018)).

At the time Plaintiffs accessed the Website, Defendant represented that they could "Decline" tracking cookies, but this was false. Moreover, Defendant is a sophisticated corporation that controls the operations of its Website and uses cookies for analytics and marketing, which means Defendant either knew the statement was false or made the statement without confirming its truth. Compl. ¶ 171. These allegations are sufficient to allege fraudulent misrepresentation at the pleading stage, including under the heightened pleading standard of Rule 9(b). *See Gabrielli v. Haleon US Inc.*, No. 25-CV-02555-WHO, 2025 WL 2494368, at *12–13 (N.D. Cal. Aug. 29, 2025) (declining to dismiss a fraudulent misrepresentation claim under California law on nearly identical facts); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")

**iv. Unjust Enrichment under Florida Law (Count Six) and California Law (Count Eleven)**

Plaintiffs' well-pleaded allegations are more than sufficient to claim unjust enrichment. Plaintiffs used the Website for their financial affairs, engaging in various online interactions which caused substantial data to be generated and shared with AdTech Companies whose purpose is to target advertising back to the Plaintiffs for the benefit of the Defendant. Compl. ¶¶ 18-20. Defendant knew of this benefit because it installed and operated the AdTech Trackers for the purpose of collecting such data, and it did so precisely to obtain the benefits associated with behavioral advertising,

(which is inherently more effective than traditional advertising) and is necessarily reliant on the collection of such behavioral data. *Id*. ¶ 22. Raymond James knew its AdTech Trackers would funnel Plaintiffs' data to AdTech Companies, and it benefitted (and continues to benefit) from the enhanced advertising generated from the profiles they have now built or enhanced with Plaintiffs' behavioral data. *Id*. ¶¶ 89-91. And yet, Raymond James did this despite Plaintiffs' clear and express denial of their consent to operate this technology exactly as Defendant did. *Id.* ¶ 98-99, 108-109. *Sherman Hills Homeowners Ass'n, Inc. v. Gibson*, 403 So. 3d 1101, 1106 (Fla. Dist. Ct. App. 2025) (describing unjust enrichment elements); and *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (same). Defendant has been unjustly enriched.

## V. CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

### Leave to Amend

Plaintiffs are confident the allegations in the Complaint are more than sufficient to meet the pleading standards. However, should the Court conclude an amendment is necessary, Plaintiffs are prepared to amend their complaint as needed.

Dated: December 19, 2025

Respectfully Submitted,

*/s/ Hank Bates*
Hank Bates (ABN 98063) (*pro hac vice*)
Samuel R. Jackson (ABN 2013247) (*pro hac vice*)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
Email: hbates@cbplaw.com
Email: sjackson@cbplaw.com

Joshua R. Jacobson (FBN# 1002264)
Jacob L. Jacobson (FBN# 0120130)
**JACOBSON PHILLIPS PLLC**
2277 Lee Road, Suite B
Winter Park, FL 32789
Telephone: (321) 447-6461
Facsimile: (407) 612-2206
Email: joshua@jacobsonphillips.com
Email: jacob@jacobsonphillips.com

*Attorneys for Plaintiffs*
*Nicole Diflumeri and Lisa Reingold*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Opposition to Defendant's Motion to Dismiss** was electronically filed with the Clerk of Court using the Court's CM/ECF system and that all counsel of record receive a copy of the document through that service.

This 19th day of December 2025.

*/s/ Hank Bates*
Hank Bates